**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **FERRIS MFG. CORP.,** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:17-cv-01024-O-BP** |
| | § | |
| **THAI CARE CO. LTD.,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court are RHS Healthcare Solutions Inc. a/k/a Reliable Healthcare Solutions, Inc. a/k/a RHS Healthcare Inc.'s ("Reliable") Motion for Partial Summary Judgment (ECF No. 154) with Brief and Appendix in Support (ECF Nos. 155–162) filed April 15, 2019; Ferris Manufacturing Corporation ("Ferris") and Sessions Pharmaceuticals Inc.'s ("Sessions") (collectively, "Plaintiffs") Response (ECF No. 166) with Brief and Appendix in Support (ECF Nos. 167–170) filed May 6, 2019; and Reliable's Reply (ECF No. 183), Appendix in Support (ECF Nos. 183–85), and Objections (ECF No. 186) filed May 13, 2019. Also before the Court are Defendants K. Carlton International Inc. d/b/a KCI Shipping Line ("KCI Shipping") and Jose Martinez's ("Martinez") (collectively, "KCI") Motion for Summary Judgment (ECF No. 151) with Brief and Appendix in Support (ECF Nos. 152–53) filed April 15, 2019 and Plaintiffs' Response (ECF No. 171) with Brief and Appendix in Support (ECF Nos. 172–175) filed May 6, 2019. KCI did not file a reply.

After considering the pleadings, briefing, and applicable law, the undersigned **RECOMMENDS** that United States District Judge Reed O'Connor Court **DENY** Reliable's

Motion for Partial Summary Judgment and **GRANT in part** and **DENY in part** KCI's Motion for Summary Judgment.

## BACKGROUND

Plaintiffs bring this suit against Defendants Thai Care Co. Ltd. ("Thai Care"), Reliable, Santo Giglia ("Giglia"), KCI Shipping, and Martinez, claiming violations of §§ 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, tortious interference with a contract, breach of contract, fraud, conversion, unfair competition and misappropriation, and common law conspiracy. (*See* ECF No. 46, Amended Complaint). Judge O'Connor dismissed Plaintiffs' Lanham Act claims against Giglia, individually, on January 23, 2019. (ECF No. 101). The following facts are drawn from the parties' pleadings, briefs, and evidence filed in the case. To the extent any of the facts are disputed, it will be so stated.

Sessions originally formulated and patented in 1988 a wound care dressing called PolyMem that is used for covering numerous types of wounds. Sessions subsequently obtained the federally registered trademark "POLYMEM" on September 1, 1992 under registration no. 1,711,093. Sessions also owns other PolyMem-formative marks, all of which are licensed to Ferris.

Ferris is based in Fort Worth, Texas and has created and manufactured wound care products since approximately 1977. In addition to the PolyMem family of products, Ferris manufactures and sells other wound care products. All PolyMem products, which come in a variety of lines and sizes, are manufactured in Fort Worth. To distribute PolyMem throughout the United States and abroad, Ferris engages various medical supply distributors. In 2010, Ferris began searching for a distributor for PolyMem in Southeast Asia. Noelene Hamies, Ferris' former Asia Pacific Regional Director, became acquainted with Maurizio Carapucci ("Maurizio"), the managing director of Thai Care, who facilitated an agreement (the "Contract") dated August 18, 2010 by which Thai Care

became Ferris' exclusive distributor of PolyMem in Thailand, Laos, Cambodia, and Myanmar (the "territory").

In exchange for preferential pricing and the exclusive right to distribute PolyMem throughout the territory, Thai Care was prohibited from, among others, (1) marketing any other wound care products that compete with Ferris' PolyMem; (2) selling, directly or indirectly, PolyMem outside of the territory; and (3) changing or modifying the PolyMem product or packaging. Thai Care was, among other requirements, obligated to maintain a specific annual dollar sales volume; to use best efforts to promote and sell PolyMem, including providing sufficient sales personnel; and to pay for overhead in performance of the Contract. The Contract was amended at least once in 2015 to update Thai Care's performance objectives, and the exclusivity provision remained.

Plaintiffs allege that Thai Care acted in concert with Reliable, a medical product retailer and distributor, and KCI Shipping, a shipping company, to sell PolyMem in the United States through Reliable's distribution channels in violation of the Contract. Reliable is a reseller of many products, including medical products like PolyMem. Reliable purchases products directly from manufacturers and other distributors for resale. In 2018, Reliable's medical product sales represented approximately 50% of its revenue. Reliable purchased 90-95% of its medical products inventory from distributors. Reliable was established in March 2011. Its business dealings with Thai Care began in 2011, and it continued to purchase products from Thai Care through 2019. One of those products was the PolyMem at issue in this case.

Reliable's purchases of PolyMem from Thai Care generally occurred as follows. To initiate the transaction, Maurizio sent a purchase order to Ferris indicating the quantity and type of PolyMem to be shipped to Thailand. Shortly thereafter, Reliable shared details of the shipment

with Martinez, an employee of KCI Shipping, including the purchase order number, name of the manufacturer, and destination of the product. Martinez then contacted Ferris to arrange transportation of the PolyMem from Fort Worth to Reliable's warehouse in Jacksonville, Florida. According to Ferris, Martinez would state that he was arranging to transport the PolyMem to Thailand. After obtaining information about the cargo from Ferris, Martinez communicated details about the shipment to Reliable, which hired trucks to ship the PolyMem to Jacksonville. In this manner, Martinez handled around twenty to thirty transactions during the relevant time period. Neither party has submitted evidence that any of the PolyMem sold to Thai Care in this fashion actually was shipped to Thailand or elsewhere outside of the United States.

Sometime in June or July 2014, Ferris began labeling select PolyMem with labels that stated, "Distributed for use in Thailand by Thai Care Co., LTD Thailand" (referred to herein as the "labels"). Reliable does not dispute that it subsequently removed these labels and resold the packages in the United States. Eventually, Ferris learned that PolyMem sold to Thai Care for distribution in Southeast Asia actually was being sold in the United States market, and it terminated the Contract.

## LEGAL STANDARD

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999). The appropriate inquiry for the Court to make is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986).

The party moving for summary judgment has the initial burden to prove there is no genuine issue of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Accordingly, a party seeking summary judgment that bears the burden of proof on an issue "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [the party's] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). To meet this burden, the movant must identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In response, the nonmovant "may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co*., 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). Citations to evidence must be specific, and "a party must support each assertion by citing each relevant page of its own or the opposing party's appendix." Local Civil Rule of the Northern District of Texas 56.5(c).

## ANALYSIS

## I.    Reliable's Motion for Partial Summary Judgment

Reliable moves for partial summary judgment on Ferris' Lanham Act claims, arguing that Reliable's sale of Thailand-bound PolyMem is protected by the first sale doctrine because there are no material differences between PolyMem products manufactured for distribution in Southeast Asia and those destined for sale in the United States. (ECF No. 155 at 15–24). Alternatively, Reliable argues if the Court were to find that Ferris' labeling of PolyMem was the only triable issue related to its material difference argument, the Court should otherwise grant summary

judgment on Ferris' claims regarding all PolyMem products sold without the labels. Ferris argues in response that Reliable failed to meet its burden on all of the elements of their first sale affirmative defense, including whether Ferris' sale to Thai Care was authorized and whether there are material differences between domestic and Thailand-bound PolyMem products. (ECF No. 167 at 38–57).

### A.  First Sale Doctrine

Section 32 of the Lanham Act prohibits the reproduction or alteration of a registered mark without the consent of the registrant. *See* 15 U.S.C. § 1114; *see also* Martin J. Salvucci, *A Federalist Account of the Law of Trade Secrecy*, 29 STAN. L. & POL'Y 183, 193 (2018) (discussing how the Lanham Act "federalize[d] trademark law on the basis of congressional authority under the commerce power"). It also prohibits the introduction of such reproductions or altered marks into commerce. *See id.* § 1114. Section 43 of the act similarly prohibits the misrepresentation of the origin or of facts regarding a marked product and prohibits the use of these misrepresented products in commerce. *See id.* § 1125.

"Trademark law *generally* does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent. Once a trademark owner sells his product, the buyer *ordinarily* may resell the product under the original mark without incurring any trademark law liability." *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1303 (5th Cir. 1997) (emphasis original). Because "unauthorized importers are *never* the first seller," "applying the first sale rule to an unauthorized importer . . . would mean that the gray-market importer would always escape liability." *Id.* However, the first sale doctrine "does not protect alleged infringers who sell trademarked goods that are 'materially' different from those sold by the trademark owner." *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 852 (N.D. Tex.

2009). "Conduct must go beyond 'merely stocking and reselling . . . to support a cause of action for infringement.'" *Taylor Made Golf Co., Inc. v. MJT Consulting Grp., LLC.*, 265 F. Supp. 2d 732, 739 (N.D. Tex. 2003). Further, the first sale doctrine does not apply if an unauthorized distributor improperly suggests affiliation with the source of the trademarked products. *Mary Kay*, 601 F. Supp. 2d at 848 (citing *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 484 (5th Cir. 2004)). Moreover, if the first sale is not authorized in the first instance, the rule does not apply. *See Martin's*, 112 F.3d at 1302 ("[T]rademark protection can extend to an owner's efforts to maintain the value and goodwill of the trademark in a particular territory . . . ."); *Taylor*, 265 F. Supp. 2d at 740 (denying plaintiff's summary judgment motion, in part, because plaintiff had not proven the first sale doctrine applied).

The parties dispute the legitimacy of the initial sale to Thai Care and whether that PolyMem was materially different from domestic PolyMem. Accordingly, as the moving party seeking summary judgment on an affirmative defense, Reliable must establish beyond peradventure Ferris' initial sale of PolyMem to Thai Care was authorized and that the PolyMem sold was genuine, that is not materially different from other PolyMem sold in the United States. *Mary Kay*, 601 F. Supp. 2d at 854 (denying summary judgment on the first sale doctrine affirmative defense); *but see Taylor*, 265 F. Supp. 2d 732 at 739 ("The exhaustion or first-sale rule is not an affirmative defense").

### B. Unauthorized First Sale

#### 1. Authorized or Unauthorized Use

"[T]he general rule is that 'trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent.'" *Matrix Essentials v. Emporium Drug Mart*, 988 F.2d 587, 590 (5th Cir. 1993) (quoting *Shell Oil Co. v. Commercial*

*Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991)). Ferris asserts that a fraudulently induced first sale, such as it alleges is present in this case, does not qualify for the first sale doctrine. (ECF No. 167 at 53–57). But the legal authorities on this issue are not settled.

In *Matrix*, the Fifth Circuit stated, "Absent more culpable conduct on the part of the seller, we are unwilling to find misrepresentation in the mere act of putting a manufacturer's product on one's shelf and offering it for sale." *Id.* at 593 (discussing section 1125(a)); *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 484 n.3 (5th Cir. 2004) ("Sales of trademarked products without authorization may constitute trademark infringement if those products are not genuine, i.e., the product harbors some defect (or potential defect) that customers would be unable to detect."). Although *Matrix* highlighted that the "culpable" conduct is normally related to a defect or potential defect in the product itself, the court did not question whether the first sale of the product was authorized.

In *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, the plaintiff was a manufacturer of hair care products including shampoos, conditioners, hair sprays, and styling lotions. 53 F.3d 1073, 1074 (9th Cir. 1995). Plaintiff distributed hair care products under its trademark to salons and distributors who all were members of an organization controlled by plaintiff, referred to as the "Collective." *Id.* Members of the Collective were limited to selling plaintiff's products to other members or their clientele. *Id.* Plaintiff went so far as to register another trademark, denoting membership in the Collective, that was affixed to the plaintiff's products. *Id.* Members of the Collective allegedly violated their agreement with plaintiff because defendant, a non-member, was successful in buying and reselling plaintiff's products, thus, prompting the suit. *Id.* In reselling plaintiff's product, defendant did not alter the packaging or product itself. *Id.* at 1076. Similar to *Matrix*, the court in *Sebastian* concluded that the defendant had done nothing more than stock and

resell plaintiff's products. *Id.* at 1076. Moreover, the court rejected the argument that defendant actively misrepresented it was a member of the Collective simply by selling plaintiff's unaltered products with the Collective membership mark affixed. *Id.* at 1077. In doing so, the court reasoned a manufacturer could "invoke the assistance of the courts in controlling downstream distribution of its trademarked products simply by placing a statement on the container that the product was being resold only by affiliates of the producer." *Id.* Thus, the court found that any confusion resulting from affiliation with the Collective membership mark was plaintiff's own doing. *Id.*

Much like the defendant in *Sebastian*, who obtained plaintiff's product from Collective members in violation of their agreement with the plaintiff, Reliable obtained PolyMem in violation of the Contract, according to Ferris' argument. However, Ferris has not cited any authority to show a purportedly fraudulent purchase makes a first sale unauthorized under the Lanham Act. The undersigned found only one unpublished case discussing the issue. *Hidalgo Corp. v. J. Kugel Designs, Inc.*, No. 05-20476-CIV, 2006 WL 8433271 (S.D. Fla. Nov. 6, 2006), *adopted by*, No. 05-20476-CIV, 2007 WL 9701924 (S.D. Fla. Jan. 31, 2007).

The first sale in *Hidalgo* included a "straw man" who was an authorized dealer for plaintiff. *Id.* at *1. The straw man did not market the products it purchased from plaintiff, but instead forwarded them to defendant who was not an authorized dealer. *Id.* The plaintiff argued that because the first sale was a "sham," it was not an authorized sale, making the first sale doctrine inapplicable. *Id.* The court rejected this argument, stating that "[p]laintiff received the benefit of its bargain under its sale contract with [the straw man]. Plaintiff thus placed the goods in the stream of commerce. That is all that the first sale doctrine requires." *Hidalgo*, 2006 WL 8433271, at *6 (citing *Sebastian*, 53 F.3d at 1076 and *Softman Prods. Co. LLC v. Adobe Sys., Inc.*, 171 F. Supp.

9

2d 1075, 1085–86 (C.D. Cal. 2001) ("The transfer of a product for consideration with a transfer of title and risk of loss generally constitutes a sale.")).

Here, Ferris sold PolyMem to Thai Care, and Thai Care paid Ferris for the products. No party disputes that a sale occurred, that the PolyMem product was not distributed in Southeast Asia, and that Thai Care apparently breached the Contract. In the absence of binding authority to the contrary, the undersigned concludes that the circumstances of the sales from Ferris to Thai Care does not prevent the first sale doctrine from otherwise applying to the facts of this case. *See Am. Int'l Pictures, Inc. v. Foreman*, 576 F.2d 661, 664 (5th Cir. 1978) ("Even if the copyright holder places restrictions on the purchaser in a first sale (such as specifying the permissible uses of the article), the buyer's disregard of the restrictions on resale does not make the buyer or the person who buys in the secondary market liable for infringement."). The analysis then turns to whether Reliable has met is burden of proving that the Thai Care PolyMem and domestic PolyMem were not materially different.

### 2. Material Difference Standard

At the outset, the undersigned notes the parties dispute whether the issue of material difference is a question of fact or law. Without analyzing them, Reliable cites three cases to support their position that a material difference is matter of law. *See United States v. Krause*, 507 F.2d 113, 118 (5th Cir. 1975) (materiality of a false, fictitious, or fraudulent statement is a matter of law); *Weinstock v. United States*, 231 F.2d 699 (D.C. Cir. 1956) (materiality of a false statement is a "question for the court."); *Pizza Hut, Inc. v. Papa John's Int'l., Inc.*, 227 F.3d 489, 495 (5th Cir. 2000) (the materiality of a misleading statement of fact in a false advertising context). As Ferris points out, these cases do not involve material differences in a Lanham Act case.

In *Mary Kay*, a Lanham Act case, Senior Judge Fish examined on summary judgment whether there was a fact question as to any material difference between products sold by Mary Kay and the defendant. 601 F. Supp. 2d at 852–54. The purported material difference involved Mary Kay's quality control measures designed to prevent expired goods from entering the stream of commerce. *Id.* at 854. In denying defendant's summary judgment motion, Judge Fish determined there was enough evidence presented by Mary Kay to establish it made legitimate efforts to keep expired goods from entering the stream of commerce, and defendants had hindered that effort to such an extent that it devalued Mary Kay's mark. *Id.* Although Judge Fish did not explicitly state that a material difference inquiry involved a question of fact, he treated it as one. Based on Judge Fish's analysis, the undersigned will treat the issue of material difference as a question of fact for summary judgment purposes. *See also SKF USA Inc. v. Int'l Trade Comm'n*, 423 F.3d 1307 (Fed. Cir. 2005) (stating the material difference inquiry "involves a question of fact.").

In cases involving gray market transactions, where imported goods use the same trademarks as those of authorized goods, the question of liability turns on whether the gray market goods are materially different from the authorized goods. *Bayer*, 259 F. Supp. 2d at 508 (citing *Martin's*, 112 F.3d at 1302). "[T]he unauthorized importation and sale of materially different merchandise violates [the Lanham Act] because a difference in products bearing the same name confuses consumers and impinges on the local trademark holder's goodwill." *Nestle*, 982 F.2d at 638. Although this case does not involve gray market goods because the PolyMem products were manufactured domestically and never left the United States, courts have applied case law involving gray market goods to non-gray market cases like this one. *See, e.g.*, *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1072 n.4 (10th Cir. 2009) ("The rationale in gray

goods cases applies with equal force in this context [of non-gray market goods]. Thus, we agree with the Third and Eleventh Circuits that the rule 'is not limited to gray goods cases.'"(citations omitted)); *see also Martin's*, 112 F.3d at 1302 (stating "trademark protection can extend to an owner's efforts to maintain the value and goodwill of the trademark in a particular territory, where the owner has endeavored to confine the use of the trademark to certain goods."). The Court will refer to the gray market case law in determining whether Reliable's sale of PolyMem violates the Lanham Act.

Courts generally apply a low threshold for determining whether products differ materially from authorized domestic products, at least in so-called gray market cases. *Bayer Corp. v. Custom Sch. Frames, LLC*, 259 F. Supp. 2d 503, 508 (E.D. La. 2003) (citing *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992)); *SKF USA*, 423 F.3d at 1313. "[T]he existence of any difference between registrant's product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion sufficient to support a Lanham Trade Mark Act claim." *Id.*

What constitutes a material difference hinges on the context of the alleged difference in relation to the product and consumer. The Fifth Circuit has held a difference in the physical appearance of a product is a material difference so long as the defendant is unable to show that an average consumer would not consider the differences in purchasing the product. *Martin's*, 112 F.3d at 1301–02 (presuming a likelihood of confusion when the products are materially different). A material difference can also be unrelated to physical appearance of the product. In *Bayer*, the district court determined there were several material differences in the flea control and prevention medication marketed under the trademark ADVANTAGE. 259 F. Supp. 2d at 508–09. In finding Bayer was entitled to a permanent injunction, the district court found the following material

12

differences between the domestic and foreign product: (1) packaging and labeling differences that did not comply with federal and state laws; (2) insufficient quality control measures as the domestic flea preventative was marketed through veterinarians; and (3) the use of British English spellings on the foreign product versus the American spellings on the domestic product. *Id.* Thus, packaging and labeling differences, quality control procedures, and even spelling differences on gray market products may be considered in a material difference analysis.

A difference in warranties may also constitute a material difference. *See Dell, Inc. v. This Old Store, Inc.*, No. CIV.A. H-07-0561, 2007 WL 2903845, at *4 (S.D. Tex. Oct. 3, 2007) ("Whether or not Defendants caused consumer confusion by indicating that they were reselling products covered by the Dell warranty is a question of fact that must be resolved either on summary judgment or at trial."); *Bose Corp. v. Ejaz*, 732 F.3d 17, 27 (1st Cir. 2013) (duration of a product's warranty); *Beltronics*, 562 F.3d at 1073 (warranties and services associated with the product). Unsurprisingly, a disparity in price also is a consideration in a material difference analysis. *Nestle*, 982 F.2d at 644; *Osawa & Co. v. B & H Photo*, 589 F. Supp. 1163, 1167 (S.D.N.Y. 1984).

       3.   <u>Application to the Case</u>

Initially, the undersigned finds that there is no evidence that the PolyMem products intended for distribution through Thai Care were physically, chemically, or technically different from the PolyMem distributed domestically. (ECF No. 155 at 8-9 (citing ECF No. 124 at 6, Amended Order on Reliable's Motion to Compel)). Further, the basic product packaging, description, lettering, and printed materials are the same. (ECF No. 156 at 14–36). Nevertheless, Ferris asserts there are material differences between PolyMem manufactured and distributed in the United States and that intended for sale in Southeast Asia by Thai Care. Ferris asserts that PolyMem intended for sale in Southeast Asia was not covered by Ferris' warranty and could not

be tracked sufficiently in case of a recall; the products differed in price; and their labeling was different. (ECF No. 167 at 45–51).

      *a.   Warranty*

The summary judgment evidence offered by Reliable shows that Ferris does not include warranty information inside or on the packaging of PolyMem or on its website. (ECF Nos. 157 at 30–31; 156 at 18–36). Nevertheless, Ferris asserts that "Thailand-bound PolyMem are materially different because [they] are not covered by a Ferris warranty and cannot be tracked." (ECF No. 167 at 45). Ferris cites to John Martin's declaration to support this contention. Martin is Ferris' Chief Financial Officer and Rule 30(b)(6) designee. Martin declared:

> 7.  All Ferris products intended for sale and distribution in the United States are covered by warranty protection until their expiration date.
>
> 8.  Specifically if a U.S.-based patient or healthcare provider experiences any issue with a PolyMem product before the product's expiration date, Ferris will replace that PolyMem free of charge, and patients and healthcare providers know that to be the case.
>
> 9.  Within the wound car industry, it is well understood that the manufacturer must have a mechanism and ability to recall products that could cause any harm to patients or that are not appropriate for use or sale for any reason.
>
> 11.  Ferris did not know that Thailand-bound PolyMem were being distributed within the United States by [Reliable]. As a result, in the case of any recall, Ferris would be unable to contact those affected individuals *and* those patients and medical care providers would be completely unaware that their PolyMem was affected by the recall. Not only could this circumstance have potentially life-threatening consequences, it would also (i) subvert consumers' expectation that Ferris could reach them in the case of any recall, and (ii) call into question Ferris' ability to control the safe distribution of its products.

(ECF No. 168-1 at 3). Ferris also cites to the testimony of James Arnold, General Counsel and President of Ferris, for the proposition that Ferris could be subject to a lawsuit if it could not properly recall its product. (ECF No. 168-2 at 450).

However, this evidence does not address whether the PolyMem sold to Thai Care and intended for export is not covered by a warranty. Indeed, Martin's declaration does not concern any warranty in relation to PolyMem intended for export. Ferris has not provided any evidence to prove that PolyMem distributed through Thai Care would not be covered by a warranty.

A review of the Contract indicates that Ferris warranted PolyMem distributed through Thai Care. The Contract specifies in section 8.6 that Ferris warrants it will use all reasonable care in manufacturing; the product will be of satisfactory quality and free from defects in materials and workmanship and product specification; and will have a shelf life of two years. (ECF No. 170 at 17). Section 8.5 also requires Thai Care to assist Ferris in resolving any customer complaints concerning PolyMem. (*Id.*). Thus, Ferris' claims that Thailand-bound PolyMem is not covered by a warranty or is covered by a warranty different from domestically distributed PolyMem is not supported by summary judgment evidence.

> ### b. Recall

Ferris also argues that the domestic and export PolyMem are materially different because of its inability to recall Thai Care products sold in the United States. (ECF No. 167 at 45–46). In support of this argument, Ferris cites approvingly to *Beltronics*, a gray market case concerning aftermarket radar detectors. 562 F.3d at 1069. In *Beltronics*, serial numbers were either removed and replaced with a phony label by the distributor or were removed altogether by the defendant prior to resale. *Id.* Beltronics had a policy that only those products bearing original serial numbers were eligible to receive certain products and services, including software upgrades, rebates, product use information, service assistance, warranties, and recalls. *Id.* In holding that a difference in warranty may constitute a material difference, the court reasoned that resellers could mitigate confusion by disclosing that the products differed. *Id.* at 1074.

As noted above, Ferris has not provided any summary judgment evidence to establish that it would not honor a warranty claim from a purchaser of PolyMem sold by Reliable domestically, and Martin's deposition testimony bolsters this conclusion. (ECF No. 157 at 169 (agreeing Ferris would endeavor to make things right for export PolyMem as much as for domestic PolyMem)). Unlike *Beltronics* where there was evidence customers were confused, thinking they were entitled to a warranty from the manufacturer, there is no such evidence from any purchaser of PolyMem from Reliable. Moreover, there is no indication in the record establishing the contours of Ferris' product warranty, except to the extent it will not honor any warranty for a product past its expiration date. Thus, *Beltronics* does not support Ferris' argument.

Ferris also cites *Zino Davidoff SA v. CVS Corp.* to support this argument. 571 F.3d 238 (2d Cir. 2009). Davidoff, a high-end luxury fragrance manufacturer, discovered counterfeit products being sold at CVS stores. *Id.* at 241. Davidoff had previously refused to sell its branded products to CVS because Davidoff only distributed products though luxury retailers. *Id.* Upon inspection of CVS's inventory, Davidoff found thousands of items with their unique production codes ("UPC") removed by cutting, grinding, or chemically treating the UPCs. *Id.* at 241–42. The district court granted Davidoff a preliminary injunction that enjoined CVS from dealing in any way with Davidoff's trademarked goods. *Id.* at 240. The Second Circuit affirmed because Davidoff adequately showed that it used the UPCs to detect counterfeits, and the UPCs allowed it to guard against defects. *Id.* at 244–46. The court also held that "damage to the packaging furnishe[d] an additional basis, over and above the detriment to the mark holder's ability to detect counterfeits and to guard against defects, to justify the grant of the preliminary injunction." *Id.* at 246.

Here, Ferris does not describe its procedure for recalling products other than Martin's declaration in paragraph 10 and Arnold's testimony. But this evidence is insufficient to establish

Ferris' recall procedure. *See Mary Kay*, 601 F. Supp. 2d at 853 (holding Mary Kay presented evidence of its control procedures and how it implemented those procedures to keep expired product out of the stream of commerce). Further, Ferris' assertions about customer's expectations, without any evidentiary support, is also insufficient to create a triable issue of fact on this issue. Accordingly, Ferris has not presented sufficient evidence to establish that its warranties and recall procedures for PolyMem sold domestically and that sold to Thai Care were materially different.

### c.   *Price Disparity*

Reliable does not contest that there is a price disparity between the PolyMem distributed domestically and that sold to Thai Care for distribution in Southeast Asia. Instead, Reliable argues that if price, separate from any product attribute, can qualify as a material difference, such a conclusion would render a gray market infringement analysis meaningless. (ECF No. 182 at 13). Reliable cites *Nestle* to support this proposition. In *Nestle*, the trademarked chocolate confection at issue was manufactured in Italy and sold in Puerto Rico through the defendant, Nestle's authorized distributor. *Nestle*, 982 F.2d at 635. Nestle had previously licensed its trademark to a different company in Venezuela to manufacture and sell chocolates bearing the same trademarked name. *Id.* The chocolates manufactured in Venezuela differed in presentation, variety, composition, and price from those manufactured in Italy and distributed in Puerto Rico. *Id.* The Italian-produced chocolates were more expensive than the Venezuelan chocolates. *Id.* at 643 (the same eight-oz. quantity of Italian chocolate sold for $12.99 while the Venezuelan counterpart sold for $7.50). Specific to price, the court in *Nestle* stated that "without a doubt" price is a variable with which customers are concerned. *Id.* at 644. The court observed that the fact consumers were willing to pay over five dollars more for the Italian-made chocolates suggested they may care about

other differences between the products besides prices. *Id.* The court ultimately held that in the aggregate the differences between the two products were material. *Id.*

Although it is true that *any* unsupported difference in price could make a gray market analysis meaningless, Reliable misses the mark because such an analysis focuses on *material* differences that are likely to cause customer confusion or damage to a trademark holder's goodwill. *See Bayer*, 259 F. Supp. 2d at 508 (citing *Martin's*, 112 F.3d at 1302 and *Nestle*, 982 F.2d at 638). Here, Ferris merely presents price disparity as a material difference. Although Ferris explains that the price it charged for PolyMem sold to Thai Care was less than the domestic counterpart because of sales force expenses, marketing, and the overall sensitivity to price in Thailand, these considerations do not show how price disparity is likely to cause confusion or damage Ferris' goodwill with domestic consumers. Although price is likely a factor considered by PolyMem consumers, Ferris has not presented any summary judgment evidence showing how the price disparity, alone, has "sever[ed] the tie between" the PolyMem trademark and its associated bundle of traits. *Nestle*, 982 F.2d at 641.

More damaging to Ferris' position is the lack of evidence showing the prices Reliable charged for PolyMem sold in the domestic market. Ferris cites to spreadsheets that represent a compilation of its sales to Thai Care and to the domestic market broken down by codes. (ECF No. 170 at 2–9). The information contained in the spreadsheets is supported by Martin's declaration. (*See* ECF No. 168-1 at 2–5 ¶¶ 12–14). Martin declared the spreadsheets contain prices for PolyMem that Ferris sold to Thai Care compared to the average price of those products Ferris sold domestically over certain periods of time. (*Id.*). However, Martin's declaration does not describe the prices Reliable charged for Thai Care PolyMem sold in the domestic market. The headings on these spreadsheets are consistent, stating "2011 to 2016 Sale to ThaiCare Compared to ALL

Domestic Distributors" and "Sale to Thai Care from Ferris Compared to Sales to Domestic Distributors." (ECF No. 170 at 2, 6–7). Thus, while helpful to understand Ferris' pricing strategy, the spreadsheets, taken in light most favorable to Ferris, do not evidence that Reliable sold PolyMem at a price that might damage Ferris' goodwill. Accordingly, there simply is no evidence of a price disparity to support a conclusion of a material difference on that point.

### d. Labeling

Ferris argues that the labels, which it began applying to Thai Care products in 2014, are a material difference sufficient to defeat Reliable's motion for partial summary judgment. (ECF No. 167). As part of its warranty argument, Ferris submitted evidence of an internal standard operating procedure regarding labeling and other matters. (ECF No. 170 at 50–53). However, the procedure is plainly dated January 29, 2018. (*Id.*). Thus, it is not evidence that the procedure existed during the alleged infringement period. And, as discussed above, the warranty argument lacks evidentiary support to defeat Reliable's summary judgment motion.

Ferris also presented evidence that customers rejected PolyMem because they were labeled differently than PolyMem intended for domestic sale. The labels stated, "Distributed for use in Thailand by Thai Care Co., LTD Thailand." (ECF No. 168-1 at 10–14). At first blush, a customer rejection due to the label bolsters Ferris' material difference argument. Ferris supports this contention with the deposition testimony of the Rule 30(b)(6) representative of Golden Max, LLC d/b/a Optimal Healthcare Solutions ("Optimal"). (ECF No. 168-2 at 480). Reliable began supplying Optimal sometime in late 2013 or early 2014. (*Id.* at 487). After Optimal received PolyMem with the label affixed, it rejected the product and requested a return goods authorization. Optimal rejected the labeled PolyMem for two reasons: (1) the packaging with the label did not match Optimal's approved photo library and thus did not meet its quality control standard and (2)

19

the label indicated the goods were marked for foreign markets, contradicting its contract with Reliable. (*Id.* at 493–99). Optimum later clarified that if PolyMem with the label affixed made it into its supply chain, that fact could lead to a problem with its customer base because it indicated a deficiency in its quality receipt process. (*Id.* at 500–01). Thus, Optimal's reason for rejecting Reliable's "nonconforming" PolyMem was not because the product itself was different, but because any variance in packaging was symptomatic of an internal quality control or supply chain issue.

Ferris also presented evidence from another PolyMem customer, Q-Med Corporation ("Q-Med"), which asked for a return of goods authorization for PolyMem with the labels affixed. (ECF No. 170 at 42–47). Q-Med's corporate representative testified that when products have a label "such as [a] UPS sticker, a vendor name sticker, [or] an export sticker" affixed, the label may be removed and accepted if the product was on backorder and if counsel approved. (ECF No. 185-6–7). Otherwise, Q-Med returned the PolyMem with Ferris' label affixed, because it was too laborious to remove. (*Id.* at 7–8).

The evidence in the record does not show that the label applied by Ferris to Thailand-bound PolyMem was required by law, helped Ferris track the product through its supply chain, or indicated any physical difference, or that removal of the labels damaged the packaging or somehow compromised the integrity of the PolyMem product contained therein. However, the evidence shows that some of Ferris' customers rejected labeled PolyMem products because of relevant consumer issues concerning quality control and supply chain integrity. Further, while Optimal and Q-Med had their own reasons for rejecting the labeled PolyMem products, the fact a rejection occurred is evidence that some consumers reacted negatively to the labeled product thereby harming Ferris' goodwill.

The undersigned concludes that the difference in labeling may have constituted a material difference between the two classes of PolyMem, and Reliable has not met its burden to prove otherwise. After considering each alleged material difference, the undersigned finds there is a genuine issue of fact on whether the labels create a material difference between domestic and Thai Care PolyMem. Accordingly, the undersigned recommends that Reliable's partial motion for summary judgment be **DENIED**.

Further, the undersigned finds the exact timing of when Ferris began affixing labels to Thailand-bound PolyMem is also a fact issue for the jury to decide. The evidence suggests labeling may have started on some of the Thai Care PolyMem in 2014. (ECF No. 157 at 8, Martin Deposition ("[I]n June, slash, July 2014, we introduced labels on selected boxes . . . .") (Q: Okay. So do you recall the introduction of this [labeling] practice around 2014? A: Yes.)); (ECF No. 160 (the email Martin referred to in his deposition indicating June/July 2014)). However, this issue is not sufficiently proven in the summary judgment evidence such that Reliable should prevail as to Ferris' alleged damages sustained prior to June 1, 2014. The timing and extent of the labeling is unclear. Accordingly, Reliable's motion for partial summary judgment on all Lanham Act claims arising prior to June 1, 2014 should be **DENIED**.

## II.     KCI's Motion for Summary Judgment

The Court now considers KCI's Motion for Summary Judgment concerning Ferris' claims of (1) contributory trademark infringement, (2) common law fraud, (3) tortious interference with a contract, (4) conversion, and (5) common law conspiracy. (ECF No. 46). KCI did not file a reply to Ferris' Response. The Court notes that Ferris' claim for contributory trademark infringement arises under federal law and the remaining claims arise under Texas law.

### A.  Contributory Trademark Infringement

To establish a claim for contributory trademark infringement, a plaintiff must show that the defendant either: (1) "intentionally induced another to infringe" plaintiff's trademark or (2) "continued to supply its product to one whom it knows or had reason to know was engaging in trademark infringement." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853–54 (1982). "A party is liable for contributory infringement when it, 'with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another.'" *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) (quoting *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). The knowledge element may be established through willful blindness. *Louis Vuitton Malletier v. Eisenhauer Rd. Flea Mkt., Inc.*, No. SA-11-CA-124-H, 2011 WL 13237798, at *2 (W.D. Tex. Dec. 19, 2011) (citing *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992)). Contributory infringement cannot occur without there being direct infringement. *Phoenix Entm't Partners LLC v. Boyte*, 247 F. Supp. 3d 791, 797 (S.D. Tex. 2017).

KCI challenges whether there is evidence to support Ferris' contributory trademark infringement claim. (ECF No. 152 at 9–13). KCI argues that because they did not remove the labels; know the final destination for Thai Care PolyMem; or know that Reliable was allegedly infringing Ferris' trademark by selling PolyMem into the domestic market, Ferris' contributory trademark infringement claim must fail. (*Id.*).

Ferris does not dispute that KCI had no knowledge of Reliable's acts of removing the labels or that the market-shifting scheme allegedly infringed Ferris' trademark. Ferris argues instead that because there is evidence to establish that KCI participated in shipping PolyMem to Jacksonville and not to Thailand, this is sufficient evidence to defeat KCI's Motion because it shows KCI was

aware that Reliable's scheme was wrongful. (ECF No. 172 at 49). Ferris cites to *Cartier Int'l B.V. v. Liu*, No. 02 CIV. 7926 (TPG), 2003 WL 1900852 (S.D.N.Y. Apr. 17, 2003) to bolster its position that by merely shipping the goods at issue a shipper can be found contributorily liable.

*Cartier* involved a counterfeiting scheme in which the shipping company was located next door to the counterfeiters' operations, handled the actual transactions of the counterfeit goods by delivering payment to the counterfeiters, counterfeit goods were seized at the shipping company's location, and the shipper made claims against the handler of goods for damaged merchandise indicating the goods at issue. *Id.* at *2. The district court refused to vacate the injunction against the shipping company because there was sufficient evidence that the shipper knowingly assisted the counterfeiters. *Id.*

Although there is no evidence KCI knew or participated in removing the labels, the issue is whether KCI knowingly participated in furthering trademark infringement. Ferris has submitted summary judgment evidence showing that KCI participated in twenty to thirty Ferris to Thai Care transactions, and KCI arranged PolyMem shipments to Jacksonville instead of Miami as instructed by Ferris. Martinez testified he was surprised that none of the PolyMem received by Reliable in Jacksonville ever made it to Thai Care in Thailand. (173-2 at 405–06). In Martinez's view, he thought Reliable and Thai Care had lied to him about who ultimately received the PolyMem and where it was received. (*Id.* at 406–07). However, in one instance, shipping documents with a barcode affixed were left with Ferris. (ECF No. 173-3 at 52–54). Martinez sent an email to Reliable expressing his concern about the address linked to the barcode. (*Id.*). Reliable responded to Martinez and asked him to address the issue directly with the trucking company's driver who left the shipping documents. (*Id.*).

Although KCI's participation in the transactions at issue is not as involved as the shipper in *Cartier*, Ferris has presented sufficient summary judgment evidence showing that a reasonable juror could find KCI is not an innocent participant. Further, the evidence presented creates a fact question as to whether Martinez was willfully blind to whether the transactions infringed Ferris' trademark. Moreover, Martinez's credibility on this issue should be addressed by the trier of fact, not by the Court. *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009) ("In reviewing the evidence, the court must 'refrain from making credibility determinations or weighing the evidence.'") (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)). Accordingly, KCI's summary judgment motion on Ferris' contributory trademark infringement claim should be **DENIED**.

### B.  Common Law Fraud

In Texas, the elements of common law fraud are:

(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Allstate Ins. Co. v. Receivable Fin. Co., L.L.C.*, 501 F.3d 398, 406 (5th Cir. 2007) (quoting *In re First Merit Bank*, N.A., 52 S.W.3d 749, 758 (Tex. 2001)).

KCI asserts that there is no evidence that it made a material representation on which Ferris relied to continue to sell PolyMem to Thai Care. (ECF No. 152 at 12–13). "Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (quotation omitted). Ferris offered evidence that KCI's employee, Martinez, represented to Ferris that the shipments of PolyMem

24

were destined for Thailand. (ECF No. 173-2 at 371). Ferris also submitted the declaration of Judith Beckam, a Ferris Customer Service Supervisor, who declared she spoke and corresponded with Martinez concerning the logistics of PolyMem to be purchased by Thai Care. She also attached an email from Martinez, indicating he had a conversation with a Ferris employee in which he described a shipment of Thai Care PolyMem destined for Bangkok by way of Fort Worth and Miami. (ECF No. 175 at 1174). Moreover, Martinez testified he arranged freight for between twenty to thirty Ferris to Thai Care transactions, (ECF No. 173-2 at 375–76), and Ferris thought the PolyMem was going to Thailand (*Id.* at 442–43). Martinez also testified about invoices he created for freight forwarding services he provided to Reliable in connection with Ferris purchase orders, indicating the product was to be shipped to Jacksonville, Florida. (*Id.* at 366–68).

For the fifth element of fraud, "the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018). "Justifiable reliance usually presents a question of fact." *Id.* at 654. To provide evidence justifying their reliance on Martinez's statements, Ferris cites to Martinez's testimony where he discussed how he had a good rapport and relationship with Ferris such that they trusted him. (ECF No. 173-2 at 390–91). Further, Ms. Beckman declared that but for Martinez's statements concerning shipments of PolyMem to Thailand, Ferris would not have continued to fill orders for Thai Care. (ECF No. 173-1 at 19 ¶ 5).

Taken together and viewed in light most favorable to Ferris, there is sufficient summary judgment evidence for trial on the issue of whether Martinez told Ferris that PolyMem was shipped to Thai Care in Bangkok, but instead was shipped to Jacksonville, and that Ferris relied upon and was justified in relying upon Martinez's representations. Therefore, KCI's summary judgment motion on Ferris' common law fraud claim should be **DENIED**.

### C. Tortious Interference with a Contract

Under Texas law, tortious interference with a contract requires the plaintiff to show "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

KCI claims because they had no knowledge of the Contract, much less its terms, KCI could not have willfully or intentionally induced any party to breach the Contract. (ECF No. 152 at 13). The interfering party must have "actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship." *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 490 (5th Cir. 2008) (quotation omitted) (Texas law); *see also Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 397 (5th Cir. 2013) (stating the intent element is properly analyzed by examining whether the tortfeasor knew or should have known of plaintiff's interest in the contract).

Ferris has presented summary judgment evidence to establish KCI knew of some sort of business relationship between Thai Care and Ferris. What is missing, however, is sufficient evidence showing that KCI had enough knowledge of the facts and circumstances that would lead a reasonable person to believe that the Contract contained a geographical exclusivity provision. As with the contributory infringement analysis, Ferris implores the Court to deny KCI summary judgment due to Martinez's alleged lack of credibility. In a contributory infringement context, the evidence is more persuasive because it shows that PolyMem goods never left the United States, thereby leading a reasonable person to believe KCI had reason to know the scheme infringed Ferris' trademark. However, there is a paucity of evidence to support a conclusion that KCI knew or should have known of the Contract's geographical restriction sufficient to support Ferris'

tortious interference with a contract claim. Accordingly, KCI's motion for summary judgment on this issue should be **GRANTED**.

### D.  Conversion

Under Texas law, conversion of physical property requires a showing of an "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Waisath v. Lack's Stores*, 474 S.W.2d 444, 447 (Tex. 1971). "The plaintiff must prove that: (1) he legally possessed the property or was entitled to it; (2) the defendant wrongfully exercised dominion and control over the property, excluding the plaintiff; (3) the plaintiff demanded the property's return; and (4) the defendant refused." *Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 705 (5th Cir. 2009).

KCI challenges whether there is evidence it exercised dominion and control over the PolyMem goods to the exclusion of Ferris. (ECF No. 152 at 15). KCI argues because it never took possession of or owned the PolyMem, and Ferris was not the legal owner of the PolyMem, Ferris' conversion claim must fail. (*Id.*). KCI challenges whether there is evidence Ferris was entitled to the PolyMem products and that KCI wrongfully exercised dominion and control over them. KCI purportedly cites to the deposition testimony of Martinez to support its argument. However, the citation states, "KCI Defendants' [sic] will supplement designations from Jose Martinez's Deposition, once a transcript is received." (*Id.* at 15 n.1). KCI has not filed a reply to Ferris' Response or otherwise provided Martinez's deposition designations. Thus, KCI's statements are simply argument unsupported by any evidence.

Ferris argues that KCI exercised possession and control when it acted as a shipping agent and that Ferris owned the PolyMem at the time of the conversion. Here, the summary judgment

evidence shows that KCI arranged for shipment of the PolyMem. KCI, through Martinez, communicated with Ferris once Reliable provided Martinez with a purchase order. (ECF No. 173-2 at 303). Thereafter, Ferris supplied Martinez with pertinent shipping information (number of pieces, pallets, and dimensions of the cargo) that he subsequently relayed back to Reliable. (*Id.*). According to Martinez, KCI did not actually hire the trucking company to transport PolyMem as that was Reliable's responsibility. (*Id.* at 306).

Ferris does not cite to any summary judgment evidence to establish that it had any ownership interest in the goods when Martinez initiated communication with it about specific purchase orders. However, Section 6.3 of the Contract states that "Property in goods shall not pass to Thai Care Ltd until Thai Care has discharged all outstanding indebtedness to Ferris whatsoever." (ECF No. 170 at 16). Moreover, payment under the Contract was due not more than sixty days after issuance of the invoice, which was at the time of shipment. (*Id.*, Section 6.2). Later, payment terms were extended to ninety days under the amended contract. (*Id.* at 39, Schedule C). Thus, the Contract establishes Ferris retained a property interest in the goods until at least sixty or ninety days after the PolyMem goods were shipped. Because conversion need not be a physical taking, evidence of Martinez's actions in arranging the shipment of PolyMem to Thailand, when the goods were actually shipped to Jacksonville, raises a fact issue on whether KCI wrongfully exercised dominion and control. *See Killian v. Trans Union Leasing Corp.*, 657 S.W.2d 189, 192 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.) ("Conversion may be direct or constructive . . . ."). Thus, there is sufficient summary judgment evidence to raise an issue for trial on Ferris' conversion claim. Accordingly, KCI's summary judgment motion should be **DENIED** on this issue.

### E.  Common Law Conspiracy

The Texas Supreme Court has established the elements of civil conspiracy as "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Chon Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). KCI argues there is no evidence of any unlawful act by it or any Defendant. (ECF No. 152 at 16). Because fraud is a valid basis for a civil conspiracy claim and the undersigned recommends that KCI's motion for summary judgment on Ferris' fraud claim be denied, KCI's summary judgment motion on Ferris' conspiracy claim likewise should be **DENIED**. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001) ("Fraud is the unlawful purpose or means that forms the basis of [plaintiff's] conspiracy . . . .").

### RECOMMENDATION

The undersigned **RECOMMENDS** that Judge O'Connor **DENY** Reliable's Partial Motion for Summary Judgment (ECF No. 154); **GRANT in part** KCI's Partial Motion for Summary Judgment (ECF No. 151) as to Ferris' tortious interference with a contract claim; and otherwise **DENY** KCI's Motion for Summary Judgment.

A copy of this Findings, Conclusions, and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Findings, Conclusions, and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b)(1). In order to be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

      **SIGNED ON** May 23, 2019.

_____
Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE